Good morning. May it please the Court, Michael Schaffler on behalf of Appellant William Ward, and I'd like to reserve three minutes of my time for my rebuttal. Mr. Ward was arrested five years after he was indicted. The reason for that delay is the crux of this appeal. The District Court blamed Mr. Ward even after it found that law enforcement was lackadaisical in apprehending him, and even after it presumed that Mr. Ward had been prejudiced by the delay. The District Court's conclusion, however, is not supported by the record, and is based upon a clearly erroneous findings of fact. MS. WARD So what did the District Court say about prejudice? MR. SCHAFFLER Your Honor, the District Court presumed that Mr. Ward had been prejudiced by the delay. MS. WARD All right. But then that's a rebuttable presumption, right? MR. SCHAFFLER That's correct, Your Honor. MS. WARD All right. So the Court didn't ultimately find that he was prejudiced, right? MR. SCHAFFLER I believe the Court is correct that the Court did not make a finding that he was prejudiced. The Court made a presumed prejudice. MS. WARD You said that the Court found that he was prejudiced. MR. SCHAFFLER I apologize, Your Honor. MS. WARD Okay. You said the ultimate finding is what we have to look at. MR. SCHAFFLER That's correct. THE COURT Did the Court find that he wasn't prejudiced? MR. SCHAFFLER No, Your Honor. The Court THE COURT He assumed it was the government was acting in good faith. MR. SCHAFFLER That's right. THE COURT Okay. MR. SCHAFFLER The Court simply presumed that he had been prejudiced, and found that the cause for the delay, the blame for the delay, if it were, was on Mr. Ward. And I would submit to the Court that that finding is clearly erroneous, and it's not supported by the record. First, I'd like to point out that Mr. Ward was unaware of the indictment. And I think that that's a point of great significance. In the cases that are cited by the parties in the briefs, courts have not placed the blame on the defendant in any instance where the defendant was unaware of the charges. And in this way, this case would be unique. The evidence is uncontradictive that Mr. Ward did not know that he had been indicted or that law enforcement was looking for him. THE COURT What would be a natural inference from the fact that there was evidence in the record that he had a false driver's license and had spent a significant amount of time in other states, and, you know, he wasn't keeping a real, you know, he was kind of coming and going? I mean, is there an inference you can make from that? MR. WARD Your Honor, to parse that out, I think there is not the inference that the district court made. I don't think you can make that inference. MS. GOTTLIEB Why wasn't the inference permissible? MR. WARD Well, Your Honor MS. GOTTLIEB It may not be the one you wanted the district court to make, but why wasn't it a permissible inference? MR. WARD Your Honor, with respect to the aliases, taking that part first, the first alias, the Eric Lee Washington identification, it doesn't fit within the relevant time period. It's from 93. It expired in 95. Law enforcement had no reason to believe it had been renewed. And, in fact, law enforcement didn't think he was Eric Lee Washington. They didn't go looking for Eric Lee Washington. From early on, they knew it was William Ward, and that's who they were looking for. With respect to the Missouri driver's license that the government advanced as another false identification, he didn't even apply for that one until August of 2004. That's well after the government had abandoned its search for Mr. Ward. So I would submit to the Court that the alias issue, it didn't affect the investigation. MS. GOTTLIEB But a lot of people have the same license their whole life in their name. MR. WARD That's correct. And Mr. Ward did have a driver's license in his name. MS. GOTTLIEB That's an extra one. MR. WARD That's true, Your Honor. But I think the point is, with respect to the aliases issue, is that it didn't throw the government off the scent. It didn't cause any part of the delay. The government was MR. WARD That wasn't the issue. The question was whether or not you said he didn't have any reason or there's no evidence to suggest that he wasn't aware of the indictment. The fact that he engaged in maybe a driver's license predating any event, obviously, doesn't sound like it's persuasive. But the fact that he got a driver's license in Missouri under an assumed name MR. GOTTLIEB I'm sorry. If I could interrupt. It wasn't under an assumed name. It was a false address. MR. WARD False address. Okay. Sorry. False address. Then that could be consistent with his continuing to evade discovery. I know you cite the fact that, more immediately, he was living in Los Angeles area under his regular name, fairly openly. But it may say that he wasn't, he didn't throw the government off, but it doesn't speak necessarily to whether or not, in his mind, he was trying to avoid detection. MR. GOTTLIEB Your Honor, in one of the cases cited in Appellant's brief, United States v. Brown, it's an out-of-circuit case in the Sixth Circuit, the Court confronted precisely that issue, where the defendant had a false, false identification or was using an alias, and the Court arrived at the conclusion that use of an alias doesn't support the inference necessarily, that he was trying to evade law enforcement. And the facts are very similar. In Brown, the defendant had a false identification in order to be able to drive because his prior evidence that Mr. Ward's license had been suspended. And so I don't think that any inference that he used the driver's license was to avoid law enforcement in this case. MR. SMITH How about the fact that law enforcement thought he lived with his parents, and when they went to talk to his parents, they didn't know where he was. They didn't tell law enforcement where he was. And presumably, he might have found out. Police were looking for him by then, wouldn't you think? MR. BROWN Well, Your Honor, the record shows that law enforcement concocted a ruse because they didn't want to tip him off. So when they went to the house, they said that they were LAPD, that they were looking for him with respect to a cell phone issue. It is true that he did go to the parents' house, and I wouldn't fault law enforcement for starting there. I think where I would quibble with the investigation is the fact that over time, over four or five years, nothing changed. And that's similar to other cases such as Doggett, where what we have is law enforcement has a presumption of where the defendant lives that becomes more and more questionable, and yet they don't do anything about it. They don't change anything. Here, the same thing. They started it at his parents' address. After a little while, it turned up empty, and they did nothing about it, even when good leads came in. For instance, they had a lead that he lived at this Kelso address, that he received a driver's license to that address. They didn't even go by. They didn't knock on the door. They didn't drive by a single time. They submitted a postal verification form to see who was receiving mail there. It came up with two other names other than Ward. They never followed up on that, which I think, not coincidentally, rebuts the belief that they thought he might be using an alias, because if they got two different names that they weren't expecting, but yet they didn't even follow up on it, it's hard for me to believe that they really believed he was using an alias. If I could at this time, I'd like to reserve the balance of my time. Thank you. Good morning. May it please the Court, Becky Walker for the United States. This is clearly a pre-9-11 case, isn't it? Yes, it is. This kind of investigative lackadaisicalness is pretty astonishing. Well, I think you have to look at the investigation as an entirety, though, and in the beginning of this investigation, the law enforcement agents, in fact, did engage in quite diligent efforts to locate the defendant. At the time he was indicted, in September of 1999, they had already gained a significant amount of information suggesting the most likely place where he would be, and that was the 830 Maitland address. And at that point in October of 1999, immediately after the indictment, they conducted seven surveillances at that address. Surveillances consisting of what? Spending time outside the residence. Not just drive-bys? No. I believe the records show that they would stay there for some period of time. They also did conduct some car checks throughout their investigation, which were more of drive-bys to see whether an identifiable car was there. But the surveillances, they spent some period of time. The record isn't clear in every case how much time it was, but looking for a defendant or other leads. And in one case, they did find another lead. They noticed that someone matching the defendant's sister's description driving a car that was registered to the defendant and followed up on that lead. That led them to another address on 3rd Avenue where they conducted four surveillances, again in October of 1999. So certainly at the beginning of the investigation, the inspectors did everything that could reasonably be expected of them to locate the defendant to no avail. They also did computer database searches, express mail label searches. And when additional information came in, they did follow up on that. In January of 2000, they did set up a ruse to see if they could lure the defendant out. They went to the defendant's parents' address, which again they had identified as 830 Maitland, and identified themselves as LAPD officers investigating a cell phone issue. It had some credibility, in fact, because there was, in fact, a cell phone issue involved and said it was important that the defendant contact them and ask the parents at that point if they knew his whereabouts. They told him that they did not. So there was not only surveillance, but some face-to-face contact, inquiries with the defendant's parents. Admittedly not telling them of the pending indictment, but that was a reasonable effort also because, of course, they did not want to tip off the defendant directly that he was facing federal drug charges because that would just make it more likely that he would flee. If they had told him about the indictment, he might have turned himself in. He might have, but I think it was also reasonable for law enforcement to conclude that that would make it more likely that he would try to evade them. And so I think they made a reasonable judgment in concluding that instead they would come up with something that was serious enough to say, you know, you need to come forward, you need to talk to the police, but not so serious, namely federal drug charges, that he would have a motivation to flee the jurisdiction or to evade law enforcement's efforts. Well, what about once they get the Kelso address? I mean, that seems to be really half-baked what they were doing. Well, certainly with the benefit of hindsight, you know, it's easy to say... Well, they're supposed to engage in foresight. I mean, they're detectives, aren't they? Right. It sounds like they sort of slipped up doing fundamental... Well, I think we have to evaluate what they did in light of the information that they had at the time. And at the time that it became known that the DMV check became known to them, it looks like the earliest time was January 2003, when Inspector Foch did see the DMV, have that DMV check available to him that showed the defendant had listed his address in October of 2002 on the Kelso address. Now, at that time, he transferred the file to Inspector Fein. Prior to that, they had identified that Kelso address in an auto track search back in December of 2001. And at that time, they did follow up on that address. They did an address verification by checking with the postal carrier to find out who was receiving mail at that address. And consistently with all the other evidence in this case, defendant Ward was not receiving mail at that address at that time, and he had not listed that address with the DMV or elsewhere. At some point, we go to the yearly database checks, correct? I'm not sure what you mean by the yearly... Well, at some point, that's all that's going on? Well, by about 2000... Once we hear about 2003, yes, there was not... After Inspector Fein took over the file, and then during 2002 also, yes, there was... Well, do you contend that a yearly database check always constitutes diligence, or are you saying that it supports a finding of diligence in this case? It wouldn't always. If that's all the inspectors ever did, of course, I don't think that we would stand here and say that was diligent. But in this case, in light of what had preceded it, their diligent investigation in the beginning, and investigating a number of leads, not only the 830 Maitland address, but other addresses that showed up, the Eric Washington address, the Sisters address, and the Kelso address, and the fact that they knew that there were a number of aliases that the defendant had used, none of which led them to the defendant, had engaged in significant periods of time trying to find the defendant with no luck. At that point, they did scale back their efforts, not unreasonably, because they do have to make choices about where they spend their time. Their efforts up to that point had not been fruitful, so they did scale back, and at that point began simply doing database checks on a less frequent basis. So they get a tip. They check out Kelso. He bails out on that one because he doesn't get his name. Then they get the driver's license that gives the Kelso. So we've got two hits on the Kelso address, and what do they do with that? Well, they're separated in time. How long? Well, December 2001 is the first time that they saw, and that's when they conducted the address verification. It was January 2003, I believe, when the postal inspector saw it. And then how long between then and when they finally did anything? At that point, he was arrested in September 2004. Almost two years, isn't it? And admittedly, that was a slip on that part. I mean, at that point, they did miss the Kelso address at that point. Inspector Fein did explain that at the hearing, that when he reviewed the file, he had seen that address previously and had viewed that as a lead that had not panned out. Now, he had looked at that a little bit more carefully. He probably could have seen, again, with the benefit of hindsight, he should have seen that that DMV check came back after the address verification had been done, and possibly he should have followed up on the lead. So if we give the government the benefit of the doubt in terms of, as you say, they were diligent at the front end by going after the parents' address and putting their efforts there. But once they're tipped on Kelso, we've got, what, about 33, 34 months in there from when they first get the Kelso address? Well, I think the time that you can count when they had the Kelso address, at the very earliest was October 2002. That's when the defendant gave that address to the DMV. The postal inspectors didn't have that information until January of 2003. So October 2002 to January 2003, even if we take October of 2002 as that date, his address was in August of 2004, so we're talking about 22 months of time. Now, the trial court found that it was the defendant's fault, essentially, for the, well, was responsible for the delay. What sort of deference is that entitled to? Well, considerable deference. It's a factual finding. Doggett, as well as this court's case law, Aguirre, and the other cases cited, do say that the court's finding on that second factor regarding the government's negligence and the reasons for the delay is entitled to considerable deference. And that is warranted here. The court considered a full range of evidence from both sides, conducted a full evidentiary hearing, had both the defendant and his witnesses before him, and have the government's witnesses before him to evaluate were these efforts reasonable, was this a defendant who was trying to conceal his whereabouts. And also it was supported by the record. It's not a case where the defendant had to be aware of the indictment and purposely evading. That's not what's required in determining, making this determination. The issue is what is the reason for the delay. Does the blame lie more on the shoulders of the government or the defendant? In this case, it's a little bit of a mixed bag. I mean, the court did also note that the government's efforts had been somewhat lackadaisical and not perfect, but that the defendant's use of aliases and providing conflicting information about his whereabouts was also a significant contributing factor. And so I think the court noted both. How do the aliases play into this, in fact? Not directly, but I think in two ways. So what does that have to do with anything? Well, they support an inference that this was a defendant who was not making it easy to find himself. I mean, this is not a situation like, say, in Doggett or some other cases where you have a defendant who has a steady job, who stays in one place, has all his mail delivered to that address, and maintains a single name and a single identity. This is a situation where we know this is a defendant who has used aliases, quite a number of aliases. But that's sort of in the ether, isn't it, if it didn't have any impact on the behavior of the government here? Well, it did, in fact, I think have some impact on the behavior of the government in the sense that the government was aware that he had used different identities. Well, so if they think he's got an alias, why do they stop when the Kelso postal delivery guy says, no, it's not under his name, Ward? You're getting double credit here, it sounds like. Well, I mean, that certainly could have been, you know, something that they might have thought about. Well, he might be receiving mail in a different name, but I don't think that the names that came up. But if the government's putting the blame on the defendant for using aliases, and then they say, ah-ha, but, you know, somehow that puts the blame on him, and yet the aliases seem to be a factor in their thinking. Well, I don't think, though, that the aliases, that the names that came up at the Kelso address were actually any identified aliases that they had at least knew of for Defendant Ward. Granted, they might have been, but they didn't know. What else did he do? I mean, he went out. He occasionally went to Missouri on weekends. I mean, the court did advert to that, I guess, but what has that got to do with anything? Well, you know, he was traveling. Again, this is just, it's a little bit of context to say this is not a defendant who was. I'm just trying to say what kind of precedent is this establishing for saying that this kind of investigation, which the district court did find to be, as he put it, as you say, lackadaisical. A lot of time went by on this, and the blame is being put on the defendant. He's not a clean, perfect person. I understand that. But when one looks objectively at what the government was doing, none of what the defendant did had any apparent impact on the government's inability to find him. I mean, he was there at the address. All they had to do was go up and talk to the neighbor and say, do you know anybody named Ward in the neighborhood? Yes, he lives over there at Kelso. Well, arguably, although they certainly did not. That was not the primary address they had associated with him, and they really had no reason to, at least until October of 2002. So they did fully investigate the address, most likely. That's the disconnect I'm having. You invoke that, and the district court talks about that, but it doesn't seem to have any causal relationship to the inability to find him. Well, again, I don't think it's not a question of, you know, blaming us in the sense that he did something wrong or did something to obstruct justice or something at that level. I understand that. But whatever the court said, he's part of the reason for the delay. It doesn't seem that anything that he did, in fact, actually caused the delay. It was just that the government didn't do its job. Well, he did. Including putting the stuff at the back of the desk for a fair amount of time. Well, anyway, I think we have time. He did not maintain a steady address that was listed with DMV. That was the easiest guy to find. Not the easiest. If I could take just one minute to address the prejudice issue. Real quick, because you're over time. Thank you, Your Honor. I just would like to address that, because the court did not, the district court did not, did presume prejudice, and really the court should not have presumed prejudice in this case, having found that the government did not engage in unreasonable search efforts and that the defendant contributed to the delay. He does not have presumed prejudice in this case. And in any event, the government should have been given the opportunity to rebut the presumption. And in this case, this is, if any case is a case where the government may have been able to rebut that presumption, this is it. This is a case that did not depend on witness testimony. The defendant. I think that's all in the brief. Thank you. Your Honor, if I could just pick up on a couple of the points that came out in a, during the government's argument. First, the government alluded to the fact that law enforcement had gone and spoken with Mr. Ward's parents, and that, you know, that the parents hadn't,    And that Mr. Ward was a criminal. information about where Mr. Ward was, hadn't given an address, they sort of were vague. And there's, I'd like to point the Court to a case that really dealt with that situation as well. That's Yancey, which is cited in the briefs. And there the Court, it was a district court, pointed out the fact that it's really not a surprise to law enforcement, or it shouldn't be at least, that a parent wouldn't come clean and give up, and they're certainly not under any obligation to provide that information. In a sense, what I'm trying to impart from that is, is that that wasn't enough. That they did go there, and I'm not criticizing the fact that they went there. That's certainly what I would do, where I do in the investigation. But the fact that they essentially let it rest at that point, I think, is where you get into being able to criticize the government, their search. Second, the government point alluded that they had the CALSO address as of October 2002, or that that's when the time should count against them for having it. I would submit they had the address in December 2001. That's when they filled out the postal verification form. So really, we're not looking at 22 months. We're looking at basically three, closer to three years, 30 months. No, excuse me, 34 months. Finally, one of the points that the court made, and I think it's a very good one, is the fact that Mr. Ward, the fact that he went out of state, the fact that he didn't have a car in his name, which in fact he did for two years, but the fact that he didn't have a car after that, the fact that he didn't have a job. These are all, these would be habits consistent with a lot of people in our society, people, college students frequently change address frequently. They may not have a car in their name. They may not be employed. None of these points, none of these facts are sinister facts. None of them indicate that Mr. Ward would be trying to evade detection because of those things. What do we do with the district court's findings based on hearing all of this evidence and argument concluded that Mr. Ward was partially responsible for this, so he's part of the blame? Your Honor, I would submit that the findings just don't support, the record just doesn't support that finding. The blame certainly for the last 36 months or 34 months should be placed on the government because there we know that they weren't looking for him anymore. As the court pointed out, he had a couple, he had a couple, they did a couple database searches, but not much more than that. So I would submit that for that period, the finding that it was Mr. Ward's fault just doesn't, just doesn't hold. And I see that my time is up, Your Honor. Thank you. Thank you. We appreciate the argument. And the case of Ward is submitted.
judges: Fisher, Callahan, Collins.